MEMORANDUM OF DECISION
This memorandum of decision addresses petitions to terminate the parental rights (TPR) of three parents to three children. On May 10, 2000, DCF filed the present TPR petitions against Christopher W. and Barbara C., the biological parents of Diane and Christopher, and on February 28, 2000, against Barbara C. and Timothy B., the biological parents of Taliyah. As grounds for terminating the respondents' parental rights, DCF alleges that:
 • Barbara C. has failed to rehabilitate herself so that she could assume a responsible position in the lives of any of these children and has no ongoing parent-child relationship with her daughter Taliyah;
 • Christopher W. has abandoned Diane and Christopher, has no ongoing parent-child relationship with them, and failed to rehabilitate himself; and
 • Timothy B. has consented to termination of his parental rights for Taliyah.
For the reasons stated below, the court grants the petitions to terminate the respondent Barbara C.'s parental fights as to Christopher and Taliyah, the respondent Christopher W.'s parental rights as to Diane and Christopher, and the respondent Timothy B.'s parental rights as to Taliyah. The court dismisses the petition to terminate the respondent mother's parental rights as to Diane, for lack of clear and convincing evidence that termination would be in Diane's best interest. CT Page 17039
 I — INTRODUCTION
The court finds that the Child Protection Session of the Superior Court for Juvenile Matters has jurisdiction over the pending matter. The court finds that proper service has been made on all parties.[2] No action is pending in any other court affecting custody of these children. Christopher W., the respondent father of Diane and Christopher, has never appeared in this proceeding. No counsel was appointed to represent him, and he did not attend the trial of this matter. On the first day of trial, Timothy B., the respondent father of Taliyah, appeared and, with the advice and assistance of competent counsel, knowingly and voluntarily entered his written consent to termination of his parental rights. The respondent mother was represented by her attorney and appeared personally for trial. The petitioner and the minor children were represented by their respective counsel throughout the proceeding.
This is the second trial of a petition to terminate the parental fights of Christopher W. and Barbara C. As more fully recounted below, after the earlier trial, the court denied termination of their parental rights but transferred guardianship of both children to their paternal great-grandmother. (In the Interests of Diane and Christopher W.,
Superior Court for Juvenile Matters, Child Protection Session, Judicial District of Middletown [June 10, 1999, Quinn, J.]) (Hereafter, Memorandum of Decision, Quinn, J.) Trial of the present case was held over seven days in January, February, and April of this year, when the parties concluded evidence on the TPR petitions for Christopher and Taliyah. On motion of all parties, the court continued trial of the petition as to Diane for more reunification efforts and the submission of additional evidence. All transcripts ordered by the court had been filed by August 28, 2001, and the petitions as to Christopher and Taliyah were submitted that day to the court for decision. On October 12, 2001, the parties jointly submitted additional documentary exhibits to conclude presentation of evidence as to Diane.[3] With the submission of briefs on October 19, 2001, the petition as to Diane was also ready for decision.
The petitioner called the following as its witnesses at trial:
 • Dr. Robert Meier, Ph.D., a licensed clinical psychologist who conducted court-ordered psychological examinations and interactional assessments and testified without objection as an expert in clinical and forensic psychology specializing in child abuse and neglect and family relations; CT Page 17040
 • Dr. Robert Neems, Ph.D., a licensed clinical psychologist whom DCF engaged to supervise visitations of the respondent and her children and who testified without objection as an expert about children placed in foster care and related issues of abuse and parenting;
 • Dr. Eve Marie Perugini, Ph.D., a clinical psychologist treating Diane in psychotherapy and who testified without objection as an expert;
 • Ellen Hernandez, M.S.W., who has been counseling with Christopher since January 2000;
 • Christine Kuckel, a counselor in the specialized foster care program at Community Residencies, Inc., (CRI) who meets regularly with Christopher and his current foster parents;
 • Sandra Cuoco, assistant director of Alcohol and Drug Recovery Center, Inc. (ADRC);
 • Darcy Hall, Barbara C.'s case manager at My Sisters' Place Transitional Living Program (MSP), a supervised residential living facility where the respondent lived from March 2000 to January 2001;
 • Chrystal Williams, a DCF social worker assigned to these cases from August 2000 until her promotion to supervisor in January 2001;
 • Kelsey Laing, the DCF social worker supervisor on these cases since 1998;
 • Susanna Patinha, a DCF social work trainee who supervised visits of the respondent mother and her infant son, Timothy, Jr.; and
 • The current foster mothers of Christopher (Dana L.) and Taliyah (Sue D.).
The respondent mother testified and offered two additional witnesses at trial:
 • Elizabeth Lawton Al-Sagaf, M.S.W., a licensed clinical social worker who has been counseling with CT Page 17041 the respondent since DCF referred the respondent to her in August 1996, had approximately seventy contacts with the respondent since March 1999, and testified as an expert on social work; and
 • Brenda Lee Lammie, M.S.W., who is employed at the Child Development Program of the City of Hartford.
All parties agreed by stipulation at trial that the court could take judicial notice of the contents of the court's files regarding all three children. In addition, the petitioner and respondent mother both introduced numerous documentary exhibits.
The court has carefully considered the verified petition, all of the evidence, including the social study and other exhibits, and the testimony presented, according to the standards required by law.[4]
Upon such consideration, the court finds that the facts recited in this decision were proven by clear and convincing evidence at trial.
 II — ISSUES PRESENTED
Diane and Christopher have been in continuous state custody since August 1994 and Taliyah since May 1997. Barbara's behavior during the years since her children were removed has exhibited many problems: uncontrolled anger, cursing and other abusive language, violent and threatening conduct, living with physically and verbally abusive male partners, and alcohol and drug abuse. On numerous occasions she has been observed striking her children or not responding to their needs. The evidence and court files are replete with instances of such behavior. Certain examples are set forth in the margin,[5] but it would serve no purpose to include more than an illustrative sample.
The respondent admits that these problems have prevented her from meeting her children's needs. At the last trial, Ms. C. stipulated that she had not yet, as of the adjudicatory date in that proceeding, sufficiently rehabilitated herself that she could meet Diane's and Christopher's needs, and that court so found by clear and convincing evidence. In its memorandum of decision, the trial court also found that she "continues to have problems with her anger and managing the explosive behavior that results when she is angry." (Memorandum of Decision, Quinn, J.) Throughout the present proceeding, however, Barbara C. has steadfastly insisted that she can now meet her children's needs or, at least, that DCF has not met its statutory burden of proving by clear and convincing evidence that she is unable to do so. CT Page 17042
Although a court must make numerous findings before terminating parental rights, the evidence here left no room for doubt on many of the required findings, which are set forth below. The court's decision here essentially turns on three issues: whether the respondent mother has sufficiently rehabilitated herself so that she was able, as of the adjudicatory date here or in the reasonably foreseeable future, to meet the needs of any or all of these children; whether, after four years of foster care, there is still an ongoing parent-child relationship between Taliyah and her mother; and whether terminating Barbara's parental rights is in the best interest of the three children.
 III — FINDINGS OF FACT[6] A. HISTORY OF DCF INTERVENTION
 1. Removal and Commitment of Diane and Christopher
Barbara C., the mother accused here of abusing and neglecting her three minor children, was herself an abused and neglected child. She experienced both violence and rejection as a child. (Vol. I, ex. 15 at 4.) Drug and alcohol abuse were common in her home. When she was one year old, her father left the household and her parents divorced. She was raised by her mother and grandmother, who both were alcoholics and abused her. By the time she was two years old, DCF was involved with the family. Barbara was in foster care several times. (Vol. II, ex. 1 at 3.)
When Barbara's first child, Diane, was born in April 1992, the respondent was herself still a child less than sixteen years of age and, hence, a potential statutory beneficiary of DCF services. She left her mother's home seven months later. (Vol. I, ex. 3, Test. of respondent at first trial, 3/4/99 at 16-20.) When Christopher was born in September 1997, Barbara was still not yet an adult. "Despite the enormous difficulty of caring for a child while she herself was still a child, Barbara kept both Diana and Christopher . . . in her care with the help of relatives." (Memorandum of Decision Quinn J.) Barbara's relationship with the respondent father of these two children, Christopher W., began when she was fourteen years old. He was never involved in any meaningful way with the children, and left Hartford in 1994. In that same year, Barbara's mother also left the area. Barbara then became involved with Taliyah's father, Timothy B., in a long-term relationship that "has been marred by anger and domestic violence with several arrests and protective orders entered regarding their explosions." (Id.)
After leaving her mother's home, Barbara floated between homeless shelters and living on her own or with family members. (Id.) In 1993 DCF began receiving reports about her treatment of her children. The first CT Page 17043 referral was that June, when a shelter notified DCF that she had struck Diane, then fourteen months old, on the face. (Addendum, Specific Facts upon which Termination of Parental Rights is Sought, 7/18/97.) In August 1994, a shelter reported to DCF that it had asked Barbara to leave for not following rules and not feeding or supervising her children. The shelter also reported that she had struck ten-month-old Christopher in the chest and knocked him down. (Affidavit of DCF social worker attached to Motion for Order of Temporary Custody, 8/26/94.) DCF then removed Diane and Christopher from her care, and on August 26, 1994, the court,Foley, J., entered an ex parte order of temporary custody, which it sustained on September 2, 1994. On December 13, 1994, the court, Lavine,J., adjudicated the two children to be neglected and committed them to DCF for one year. (Vol. I, ex. 8.) Both children have been in foster care, or living with relatives outside the mother's home, since then.
DCF first placed Christopher and Diane in foster care with Bertha M. (Social Study filed 11/16/94, at 3.) Initially Barbara was permitted to visit them at the foster home. In July 1995, however, Ms. M. requested no more home visits because Barbara had verbally abused her. (Permanency Plan, 7/10/96 at 2.) When Barbara threatened to harm the foster family, DCF removed the children from that home. (Vol. I, ex. 10 at 5.) In October 1995 DCF placed the children with their paternal great-grandmother, Dorothy B. (Permanency Plan, 7/10/96, at 3.) At first Ms. B. assumed responsibility for scheduling and facilitating the respondent's visits with Diane and Christopher, but in summer 1996 Ms. B. reported to DCF that the respondent was telling the children to call her inappropriate names and telephoning her to start arguments. DCF then assumed responsibility for visits.
By July 1997, when DCF filed the first TPR petitions for Diane and Christopher, these children had been out of their mother's care for almost three years. On various visits with the children at the DCF office, Ms. C. had been hostile to those around her, used profane language and threatened to harm others. In March 1995, for example, DCF cancelled a visit because she refused to visit with the children at the DCF office. After being escorted out of the building by security personnel, she re-entered, overturned furniture in the lobby, then went outside and threw rocks at the windows. After that, DCF no longer allowed her to have visits at its Hartford regional office. In July 1995, a DCF staff person supervising a visit at a park became so upset by the respondent's abusive language that she drove the respondent to a police station, where Barbara was arrested after continuing to use profanity and telling her children to do the same. (Addendum, Specific Facts upon which Termination of Parental Rights is Sought, 7/18/97, at 2.)
After trial of the July 1997 petitions, the court, Quinn, J., issued a CT Page 17044 memorandum of decision on June 10, 1999, finding as statutory grounds for termination that as of July 22, 1997, Christopher W. had abandoned both children and Barbara C. had failed to rehabilitate herself sufficiently to be able to meet the children's needs then or in the reasonably foreseeable future. The court, however, did not find termination of either party's parental rights to be in the children's best interests and transferred guardianship of Diane and Christopher to their paternal great-grandmother, Dorothy B. After Ms. B. was no longer able to care for the children and both had left her household, DCF filed the present petitions to terminate the respondents' parental rights.
2. Removal and Commitment of Taliyah
DCF first removed Taliyah from her mother's care on October 19, 1996, three days after her birth. DCF had received information suggesting that the respondent mother had inadequate housing, had been using marijuana, and was not capable of caring for a newborn infant. (Affidavits of DCF social worker, hospital social worker, and hospital nurse attached to Motion for Order of Temporary Custody of 10/18/96.) On November 26, 1996, the court, Santos, J., confirmed an order of temporary custody and adjudicated Taliyah to be neglected and uncared for. On December 19, 1996, after Barbara agreed to live with a maternal aunt in Manchester, the court, Santos, J., vacated the order of temporary custody, placed Taliyah in the custody of her mother and the aunt, designated the aunt as the child's primary care taker, and ordered protective supervision for the next six months.
Barbara's relationship with her aunt soon deteriorated. She phoned the aunt's husband at his job and threatened to harm her aunt. She also directly threatened her aunt. The aunt later wrote a letter to the Superior Court complaining that Barbara stayed out all day and until late at night with Taliyah, was abusing drugs and alcohol, and would scream and curse at the baby. (Letter of Lallage S. attached to 2/28/97 Motion for Order of Temporary Custody.) In January 1997, Barbara left the aunt's home and began residing with Taliyah's father. On February 28, 1997, the court, Teller, J., entered another order of temporary custody, which it vacated on March 7, 1997. On that day, the court also entered an order of joint legal custody in both parents, with primary physical custody to Mr. B. The court also entered a permanent restraining order against both parents.
Only a month after that order, police responded to the parents' home on reports that Ms. C. had damaged Mr. B.'s car in retaliation for his taking money from her. A month later, both parents were again involved in a domestic violence incident. On May 19, 1997, DCF removed Taliyah from her parents' care and placed her in the foster home where she now CT Page 17045 resides. Trial on a motion for order of temporary custody was joined with a previously-filed motion to modify the protective supervision to commitment. In its memorandum of decision after a hearing on those motions, the court concluded that the parents had violated the permanent restraining order issued by Judge Teller and committed Taliyah to DCF. (Memorandum of Decision, D'Addabo, J., 9/18/97 at 5-6.)
In June 1999 DCF filed a petition to terminate the parental rights of Timothy B. and Barbara C. as to Taliyah. DCF then received positive reports from the mother's service providers. Dr. Robert Meier, after conducting a court-ordered psychological examination, recommended that Ms. C. be given six more months to rehabilitate herself and reunify with Taliyah. (Vol. II, ex. 17 at 8.) After the respondent mother filed a motion to reunify, DCF withdrew the TPR petition in November 1999. The court, Quinn, J., issued specific steps to the respondent mother to facilitate reunification with Taliyah.[7] These steps mirrored but added more specificity to similar orders entered earlier to facilitate reunion with Diane and Christopher.[8] To enhance the reunification efforts with Taliyah, DCF increased their visits from once to twice a week. In December 1999, however, after receiving reports that the respondent was still having difficulty managing her anger, DCF reduced the visits to once a week. Twice-weekly visits resumed six months later on order of a DCF hearing officer. DCF filed the present petition to terminate the parental rights of Taliyah's mother and father on February 28, 2000.
B. THE MINOR CHILDREN
Each of the three minor children here has special and distinctive needs that the court will summarize below.
1. Taliyah
Born on October 1996, Taliyah is now five years old. She has lived in the same foster home with the D. family since she was seven months old, or more than four and one-half years. She is developmentally on target (Vol. II, ex. 2 at 12) and has no significant health problems other than asthma. (Test. of Sue D.) At the time of trial, she had been in a Head Start program for a year and a half. At first she had difficulties in that program, such as wetting her pants, fighting, and being disruptive in class, but those behaviors have improved. She is very bonded to her foster parents, has adjusted well to their home, regards herself as part of their family, looks to them to meet her needs, and regards them as her psychological parents. (Vol. II, ex. 2 at 12; Meier Test. of 2/27/01 at A[9]-16.) In the visits supervised by Dr. Neems, she often spoke positively about her foster parents and said many things that made her CT Page 17046 sound connected to them. Her foster parents are very affectionate, supportive and loving to her. (Id. at A-15.) They would adopt her if she were freed for such. (Test. of Sue D.)
Taliyah refers to both her foster mother and the respondent as "mommy." She currently visits with her mother twice a week. She is usually glad to see her mother. (Test. of C. W.) During the approximately twenty weekly visits that Dr. Neems supervised of Ms. C. with these three children from August 2000 to January 2001, Taliyah showed affection for her mother and enjoyed playing with her mother and getting her attention. (Neems Test. 1/30/01 at 8.) Yet she is also extremely sensitive to her mother's anger. (Test Neems 1/30/01 at 8.) Describing the child's behavior during the supervised visitations when "her mother has gotten very angry with her and spoken to her very harshly," Dr. Neems said that "Taliyah has basically crumbled, . . . she just looks crushed, she looks down, she starts crying."(Id.) In one incident for example, Taliyah became very upset and went to Dr. Neems for comfort after Ms. C. spoke angrily to her for spilling potato chips her mother had brought. (Id. at 9.) As she has not lived with her mother for almost five years, she no longer looks to Ms. C. to meet her needs.
Taliyah is a fragile and very emotionally sensitive young child. She is also strong-willed and demanding. She does not readily accept adult limits and whines or complains when she does not get her way. At the time of the visits supervised by Dr. Neems, she was very stressed, not functioning well, and "at risk for long term, serious adjustment problems." (Vol. II, ex. 5, Dr. Neems' notes on supervised visitations, 1/04/01, at 6.) She very much needs to be protected from more stress. Both Dr. Neems and Dr. Meier, who conducted two court-ordered psychological examinations of Taliyah, concluded, and this court so finds, that in view of the length of time she has been in foster care and her overall emotional state, Taliyah needs permanency and stability now. Delay in providing such permanence is very likely to cause her long-term harm. Further visitation with her mother would disrupt her sense of connection with her foster family. (Id.)
2. Christopher
Born in September 1993, Christopher is now eight years old. After living with his mother for the first eleven months of his life, he was then in two different foster homes between August 1994 and October 1995, when DCF placed Diane and him with their paternal great-grandmother, Dorothy B., with whom he lived for the next four years. By July 1999, however, he had become out of control in her home and was having problems at school. In September 1999 he was removed from her care and hospitalized after setting a fire outside her house. At Mt. Sinai CT Page 17047 Hospital he was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiance Disorder, and prescribed various medications to control his behavior. Upon his release from Mt. Sinai, he was placed in his current foster home, with the L. family. In January 2000 he began weekly therapy with a licensed clinical social worker, Ellen Hernandez, at the Village for Families and Children.
Christopher remains deeply attached and strongly bonded to his mother. Even after six years out of her care, he still calls her "mom." (Test. of C. Kuckel.) He has told Dr. Meier, his therapist, the CRI case manager, and his foster mother that he wants to live with his mother. He would probably react quite emotionally to not seeing her and, whatever the legal disposition of this case, will probably seek his mother out even if living in a permanent placement elsewhere. He no longer views her, however, as the psychological parent to whom he looks to meet his day-to-day needs. (Meier Test. of 2/27/01 at A-18.)
At the time of trial Christopher had been living with the L. family for more than a year. The foster parents have created a good, safe environment for him, set appropriate limits for him to which he responds well, and are very caring of and bonded to him. (Test. of C. Kuckel.) Despite his behavior problems, he gets along well with all of them, especially his foster father and the baby. He has, for the most part, adjusted well there and integrated himself into their activities. Dr. Meier did not find any signs, during his psychological examination or interactional assessment, however, that Christopher has yet formed a strong bond with his foster parents.
Christopher is not readily forthcoming about his feelings. (Test. of C. Kuckel; Meier Test. of 2/27/01 at A-96.) Guarded in expressing his emotions, he distances himself from situations that are uncomfortable to him. As both Dr. Neems and Dr. Meier noted, he will tolerate emotional pain for only a certain amount of time and then instinctively pulls back. Because of the pain and hurt he has experienced, Christopher has built a "protective shield" that makes it difficult, but not impossible, for him to form a new parent-child bond. (Id. at 97.)
Despite that difficulty and Christopher's deep attachment to his mother, the evidence gave signs that such a bond with his foster family is in the process of forming. Dr. Meier noted that "Chris speaks of the foster family in much more sense that he belongs there. . . . He's incorporated himself in their activities." (Meier Test. of 2/27/01 at A-51.) Christine Kuckel, his case worker from the Community Residencies foster care program, has heard him call the foster parents "mom" and "dad." (Test. of C. Kuckel.) Although she is not a clinician and did not testify as an expert, she perceives Christopher as bonding to his foster CT Page 17048 parents, and the court finds her perception credible. Christopher has integrated himself into the foster family because he adjusts rapidly to new placements and feels part of any setting that he is in. He is eager for attention and approval from others and to connect with them. Very bright and possessing sharp analytical skills, he can verbalize his way into feeling comfortable in new situations. (Meier Test. of 2/27/01 at A-18, 51, 97, 104; Neems Test. of 1/30/01 at 59) For example, he once said to his foster mother "you're not really my mother but you take care of me like my mother." (Test. of Ms. L.) While he feels loyalty to his mother, the evidence thus shows that he also feels connected to the L. family and has begun to feel what Dr. Neems described as "torn loyalties." (Neems Test. of 1/30/01 at 59.)
Christopher is clearly a troubled young man. He has "very significant and serious behavior problems" (Meier Test. of 2/27/01 at A-18) for which he has been already hospitalized three times in his short life. He is defiant, has difficulty controlling his behavior, and presents an ever-present potential for aggressive or violent reactions. (Id. at A-18 and 84.) He is very difficult to deal with and tests limits. (Id. at A-18.) In the foster home, he has recently had problems with his homework, been defiant, and sworn at the foster parents. In school, he has problems with reading, paying attention, fighting, and profanity. (Test. of Christine Kuckel; ex. A 16 at 8.) He is physically and verbally assaultive toward his peers. (Vol. II, ex. 16 at 6.)
Because of his behavioral problems, Christopher needs a structured environment with lots of feedback from his care givers. (Test. of E. Hernandez.) Since his defiance and lack of behavioral controls are the kind of conduct likely to elicit a strong reaction from care givers, he will probably need specialized care from adults who themselves have strong impulse controls so that they can deal appropriately with his behavior. (Meier Test. of 2/27/01 at A-18.) He needs to know that his environment is safe and stable and to be allowed to make mistakes without harm to himself. He needs permanence and to see certainty for his future in terms of where he will live and with whom. (Neems Test. 1/31/01 at 60.) A child his age should not live in a temporary setting for more than two years. (Meier Test. of 2/27/01 at A-19.) Lack of permanency and stability for too long can impair a child's ability to develop a sense of trust, safety and security. (Id. at A-84.)
3. Diane
Diane remained at her great-grandmother's home after Christopher left in September 1999. But Ms. B. was also having difficulty with her. Diane was defiant, did not listen to her, would leave the house without permission, did not eat much, and was having problems in school. In early CT Page 17049 2000, Ms. B. told DCF that she was unsure if she could continue to care for Diane. Any such question, however, was resolved when DCF had to remove Diane from her care on March 27, 2000, after Ms. B. had emergency open heart surgery. (Test. of C. Williams.) Since then, Diane has been in eight placements — six foster or respite homes, then a safe house, and, since July 2001, a specialized care foster home. (Ex. A12 at 3.) Harboring an intense desire to return to her mother, she has repeatedly engaged in behavior to disrupt each placement by shutting down, not eating, and being non-responsive. (Test. of C. Williams; Perugini Test. 1/30/01 at 5.) In more recent placements, she has also become aggressive and violent. Foster parents have not found a successful method for dealing with her. Most have vainly tried to control her behavior by disciplining her, or withholding food or privileges. Although her most recent foster parents have attempted to be more nurturing and supportive, she has responded to that approach with negativity and physical abuse, for example, kicking and punching the foster mother. That foster placement, which had begun only one month earlier, was already in jeopardy by August 2001. (Exhibit A12 at 4, psychiatric evaluation conducted on 8/13/01 by Dr. Carlos Salguero, M.D.) None have succeeded in developing a lasting bond with her.
Like Christopher, Diane has retained a strong bond and attachment to her mother despite no longer looking to her as provider or psychological parent. (Vol. II, ex. 2 at 15). Unlike Christopher, who can adjust to a new home despite that bond, Diane's sense of loyalty to her mother has prevented her from doing so. As Dr. Salguero explained:
 Diane's oppositionality . . . makes it very difficult for her to remain in any one home. Diane engages in many battles daily, becomes easily irritable, and confused especially after visits with her mother with whom she has a close bond [Her] strong wishes to return to her mother [are] one of the reasons she becomes quite oppositional. Being able to adjust well to a foster home would be tantamount to capitulating in her efforts to return to her mother. . . . Diane will do everything possible to torpedo any efforts by anyone to make her stay a successful one in any foster home. . . .
(Ex. A12 at 2.) Her "parental dependency needs" — relying on her mother's presence and reactions for her own sense of security, rather than being willing to look to others for care and nurture — have prevented her from bonding with any of the foster parents. (Meier Test. of 2/27/01 at A-68, 69, 100.) CT Page 17050
Not only has Diane's sense of allegiance to her mother sabotaged her many foster placements; but the frequent resulting changes in placement have in turn increased the intensity of that attachment. (Meir Test. 2/27/01 at A-48; ex. A1 at 4-5.) Her feelings of loyalty have mutated from the normal care of a child for her mother into blaming herself for her mother's problems and feeling "that it is her responsibility somehow to fix them." (Neems Test. 1/30/01 at 4.) She has become, in Dr. Neems' words, "parentified," an eight-year-old assuming the parent's task of feeling emotionally responsible for causing and solving the family's problems. (Neems Test. 1/30/01 at 4, 49, 56, 57.) Afer DCF removed her baby brother Tim from Ms. C.'s care, for example, Diane "felt that somehow it was her fault that he was removed" because "someone must have wanted to put him with her." (Id. at 49.)
Diane is a very needy child emotionally." (Meier Test. of 2/27/01 at A-20.) Although she shares with her brother a propensity to act out physically, she does not have his ability to adapt to new situations. She is instead a "sad, rather lethargic and withdrawn" child, who is fragile, feels vulnerable, and is afraid of what is going to happen to her. She often cries to herself at night. (Id.; Vol. II, ex. 2 at 10-11.) She does not handle uncertainty or the vicissitudes of life well or cope with disappointment or surprises as well as most children her age. (Perugini Test. of 1/30/01 at 6, 9, 25) As Drs. Perugini, Neems, and Meier all observed, when faced with a disappointing or stressful situation, she withdraws, blocks out her feelings, and becomes emotionally isolated in trying to protect herself. Doing so has become a rigid, one-sided "strategy for dealing with her own sense of stress." (Id. at 6-7.)
Because of Diane's many difficulties in foster care, DCF referred her in July 2000 for weekly therapy to Dr. Eve Perugini. After seeing Diane for six months, Dr. Perugini concluded that Diane needed "more intensive care than once a week psychotherapy." (Id. at 4.) She referred Diane to the Team Works Program, which had treated Diane before and offers both a partial hospitalization program and intensive outpatient services. By late January 2001, Diane had been accepted for services by Team Works, but whether she ever received these services is not clear from the record. The documentary exhibits submitted into evidence in October merely indicated that she had recently been in a Wheeler Clinic safe home, where a physician had monitored her behavior and treatment, until being placed in her most recent foster home in July 2001. Dr. Perugini's diagnosis of Diane was Adjustment Disorder with Mixed Disturbance in Emotions and Conduct, a term describing behavior usually linked to a specific difficult event and showing symptoms of, without meeting the full diagnostic criteria for, various other disorders. (Id. at 2, 3, 27, 28.) Other clinicians have also diagnosed her as having Attention Deficit CT Page 17051 Hyperactivity Disorder, Disruptive Behavioral Disorder, Oppositional Defiant Disorder, Anxiety Disorder NOS, and Depressive Disorder NOS.
Despite her many problems, Diane is also a child of many strengths. She can be very pleasant and get along well with her peers. She is naturally athletic and very pretty. When she drops her guard, she sometimes says "`I just want to be normal' meaning that she wants to be part of a family and have siblings like other kids." (Ex. A12 at 2.) However much she wants to return to her mother, her primary need is for permanence, a home where she will receive affection, warmth, patience, and unconditional love. She needs a care giver who will provide her with structure, set firm and consistent limits, and understand her behavior and needs. (Ex. A1 at 5.) Diane will need help from both clinicians and her care givers to develop insight into and curb her disruptive behavior. (Perugini Test. of 1/30/01 at 5-6; ex. A12 at 4.) She needs stability and a sense that she is not going to be uprooted and moved. Because of her inconsistent behavior — a ready willingness to shut down emotionally coupled with physical aggression, potential care takers will find it challenging to parent her, and finding a permanent placement for her may be difficult. (Test. of Dr. Perugini and Dr. Meier.) Because her intense tie to and reliance on her mother has provided a ballast of emotional support for Diane as she has floated from one foster home to the next, it would not be in her best interest to lose all contact with her mother and yet not be placed elsewhere in a successful permanent placement. (Meier Test. of 2/27/01 at A-22, 26)
 IV — ADJUDICATORY DECISION
Trial of a petition to terminate parental rights has two phases, adjudication[10] and disposition. The burden of proof in both phases is clear and convincing evidence. In the adjudicatory phase of the proceeding, the court must make separate determinations as to reasonable efforts and statutory grounds for termination.
A. LOCATION AND REUNIFICATION
Section 17a-112 (j)(1) of the General Statutes requires the court to find whether
 • There is clear and convincing evidence that DCF has made reasonable efforts to locate the parent; and
 • There is clear and convincing evidence that DCF has made reasonable efforts to reunify the child with the parent, unless the court finds that the CT Page 17052 parent is unable or unwilling to benefit from reunification efforts. (A finding as to reasonable reunification efforts is not required, however, if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b
that such efforts are not appropriate.)[11]
 1. Reasonable efforts to locate
The court finds by clear and convincing evidence that DCF made reasonable efforts to locate Christopher W. It made service by mail at his last known address, which was provided by his grandmother and former legal guardian of Diane and Christopher. It appointed a guardian ad litem to try to locate him. It effected service by publication in the community where he was last known to reside.
2. Reasonable efforts to reunify
 (a) Diane and Christopher
On June 11, 1996, the court, Keller, J., found that continuing efforts to reunify Diane and Christopher with either of their parents were no longer appropriate. That finding removes from this court any statutory task of assessing the reasonableness of reunification efforts during the adjudicatory phase of this case.
(b) Taliyah
The court finds by clear and convincing evidence that DCF made reasonable efforts to reunite Barbara C. with Taliyah. It referred her to appropriate services to help her address the deficiencies that were preventing her from meeting this child's needs. For her substance abuse, these included inpatient and outpatient substance abuse treatment, drug and alcohol screening, relapse prevention groups, and substance abuse support groups. For her anger and personality problems, DCF referred her to anger management classes and for individual counseling. To improve her parenting skills, DCF referred her to parenting classes, parent support groups, and in-home parent support services. It provided regular visits between mother and child. To help Ms. C. and Mr. B. address their domestic violence issues, DCF referred them both to couples counseling. These were reasonable and appropriate services for the purpose of reuniting parent and child.
B. STATUTORY GROUNDS FOR TERMINATION
To prevail in a non-consensual termination of parental rights case, DCF CT Page 17053 must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112 (j)(3).
1. Failure to Rehabilitate — § 17a-112 (j)(3)(B)
Section 17a-112 (j)(3)(B) of the General Statutes provides in relevant part:
 The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . that . . . the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child, . . .
As detailed above, the Superior Court has previously found all three children who are the subject of these TPR petitions to have been neglected or uncared for. The evidence amply demonstrates, and the court so finds by clear and convincing evidence, that as of the adjudicatory date of January 29, 2001, the respondent mother had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time she could assume a responsible position in the lives of any of these minor children, in light of their ages and needs.[12]
In conducting the inquiry whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider:
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child.
"The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that which would, encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time." In re Shyliesh H.,
CT Page 1705456 Conn. App. 167, 173, 743 A.2d 165 (1999). "Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting." (Id.)
The crux of the adjudicatory ground of failure to rehabilitate is whether a parent has sufficiently addressed the deficiencies in parenting that led to state intervention in the family so that the parent can, considering the age and needs of the child, assume a responsible position in the child's life, or will be able to do so within a reasonable time. As the Appellate Court noted in In re Sarah Ann K., 57 Conn. App. 441,448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." From the "historical perspective," In Re Shyliesh, supra, 56 Conn. App. 173, the evidence and record in this case document an intertwined series of problems that have prevented Ms. C. from being able to meet the needs of any of her children. The record is replete with incidents showing explosive anger, abusive language, threatening demeanor, and, occasionally, violent behavior. Her relationship with Taliyah's father was frequently marred by domestic violence both toward and by her. Ms. C. has abused drugs and alcohol. She has not responded appropriately to needs presented by her children.
At trial here, this court heard extensive testimony and received several exhibits regarding the services provided to Ms. C. since the last TPR trial. The evidence shows that she has participated in many different service programs, some to which DCF referred her and others that she sought on her own, trying to overcome her problems and become a fit parent. Over the years she has attended individual therapy, substance abuse evaluation and treatment on inpatient and outpatient bases, relapse prevention, substance abuse support groups, parenting classes, parent support groups, couples counseling, anger management counseling and groups, and received in-home parent support services. Since the last TPR trial, she has remained in individual therapy with Elizabeth Al-Sagaf and continued to seek regular support from staff at the City of Hartford Child Development Program, where she has attended parenting classes. From March 1999 to March 2000 she resided at Coventry House, an inpatient drug treatment program for women and their children. After Coventry House, she participated in an ADRC women's aftercare group from June until at least January 2001. She lived at My Sisters' Place Transitional Living Program from April 2000 until being evicted from there on January 5, 2001. She has since lived in the community. Each week she attends Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings, goes for weekly drug and alcohol screenings at ADRC, and attends parenting classes. She regularly attends religious, diversity, and women's groups as well. From the testimony of the respondent, Ms. Al-Sagaf, and Ms. Lammie, it is CT Page 17055 obvious that the respondent has developed a nurturing and supportive network of current and former service providers and others that she seeks out regularly.[13]
The evidence also shows that she has continued to make progress in dealing with her many problems. She has not been arrested since 1997. The record does not contain any recent indication of her using abusive language or threatening demeanor or gestures. The question this court must thus consider is whether she had, as of the adjudicatory date, or will within a reasonable time, become a fit parent who can meet her children's needs. The court's analysis of this question depends in large part on the court's evaluation of conflicting opinion and fact testimony offered by the parties' expert witnesses. "Weighing the evidence . . . is the function of the trier of fact . . ." Gallo v. Gallo, 184 Conn. 36,38, 440 A.2d 782 (1981). "The probative force of conflicting evidence is for the trier to determine. . . ." In re Ashley E., 62 Conn. App. 307,316, 771 A.2d 160, cert. den., 256 Conn. 910, 772 A.2d 601.
Where there is, as here, conflicting expert testimony, it is within the court's province to decide which expert testimony, if any, is more credible. "It is in the sole province of the trier of fact to evaluate expert testimony, to assess its credibility, and to assign it a proper weight." State v. Jarzbek, 204 Conn. 683, 706, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061 (1988). "It is the quintessential function of the finder of fact to reject or accept evidence and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert." (Citation omitted.)Tartaglino v. Dept. of Correction, 55 Conn. App. 190, 195, 737 A.2d 993, cert. denied, 251 Conn. 929, 742 A.2d 364 (1999). Keans v. Bocciarelli,35 Conn. App. 239, 241-42, 645 A.2d 1029, cert. denied, 231 Conn. 934,650 A.2d 172 (1994). "In weighing the testimony of an expert, the trier of fact may accept part of the testimony of an expert without being bound by all of the opinion of the expert." Johnson v. Healy, 183 Conn. 514,517, 440 A.2d 765 (1981), quoting United Aircraft Corporation v.International Assn. of Machinists, 169 Conn. 473, 490, 363 A.2d 1068
(1975), cert. denied, 425 U.S. 973 (1976).
The respondent's therapist, Elizabeth Al-Sagaf, testified that the respondent has learned how to express her anger without using threatening language or behavior. Whereas Ms. C. once vented all her emotions "under the umbrella of anger," Al-Sagaf testified that the respondent has now learned to "identify what feeling she's feeling" and "[s]o the anger is diminished." (Al-Sagar Test. of 4/25/01 at 3.) She claimed that the respondent has learned how to verbalize her feelings and to use calming and soothing techniques. Brenda Lammie, a clinical social worker who works at the Hartford Child Development Program, did not testify as an CT Page 17056 expert, but she sees the respondent periodically. Lammie confirmed that the respondent's control over her anger has improved so that she is no longer so impulsive but will now hold her tongue, seek help or support, and handle situations more appropriately.
Dr. Robert Meier, who has conducted several court-ordered psychological evaluations of Ms. C., agreed that she has "shown significant improvement over the last two years." (Vol. II, ex. 2 at 9.) She is "much more mild and controlled than in the past" and "has gained a great deal of control over her anger." (Id.) She is noticeably more open than in the past, makes better use of programs and resources, has shown progress in understanding and controlling inappropriate behavior (Vol. II, ex. 1 at 5-8), and improved in her reactions to frustrating and anger-producing situations. (Meier Test. of 1/30/01 at A-43.)
Yet the evidence also shows compelling proof that the process of Ms. C.'s rehabilitation is far from complete. Examples include fits of anger and hostility at My Sisters' Place during the summer 2000, her relapse of marijuana usage in July 2000, her failure to tell her relapse prevention group about that relapse, and her eviction from My Sisters' Place for not complying with its rules. She still responds to situations with impulsivity and verbal hostility. (Vol. II, ex. 2 at 9.) Despite her progress to date, she still needs to work on her problems.
By far the most telling and persuasive evidence as to whether Ms. C. was able, as of the adjudicatory date or within a reasonable time, to meet her children's needs was the opinion testimony and exhibits prepared by Dr. Robert Neems. Unlike Ms. Al-Sagaf or Ms. Lammie, he had direct personal knowledge of the respondent's recent interactions with the children from the visits he supervised. He had many more opportunities than Dr. Meier to assess her parenting skills. Although there were occasions during those visits when the children enjoyed their time with their mother, or she interacted appropriately with them, there were, unfortunately, too many instances of inappropriate behavior that showed she does not understand and cannot yet meet their needs. She did not always control her anger adequately. She sometimes spoke harshly to the children but did not understand that doing so has a detrimental impact on them. She showed exceedingly bad judgment on several occasions in ways that hurt her children's feelings.
The October 19, 2000, "goodby" visit is a striking example of her poor judgment and lack of understanding of her children's needs. On that day, without prior warning to Dr. Neems or DCF, she told the children that "she wasn't coming back to visit the children here and that she was going away but didn't know where." (Vol. II, ex. 5, Dr. Neems' notes on supervised visits of 10/19/2000.) Even when Dr. Neems tried to stop her, CT Page 17057 she nonetheless persisted in her diatribe. Despite the need of each of these children to know that they are loved and feel secure, she told them that "you have got to get over the fact that no one cares about you, you are just going to have to live like this." (Neems Test. of 1/30/01 at 19.) The effect of this visit was devastating on Diane and Christopher. Diane became "very upset" (Neems Test. of 1/30/01 at 5) and "was crushed." (Vol. II, ex. 5, Dr. Neems' summary regarding supervised visits, 10/29/00, at 5.) By the next visit, she had shaved her eyebrows off as a sign of how "extraordinarily upset" she was. (Neems Test. of 1/30/01 at 5.) As a result of her mother's behavior that day, Diane became more depressed, angrier, and more resistant in her foster home than she had been. (Id. at 6.) Christopher, whose behavior had been improving in the foster home, became defiant and disobedient. His play therapy with Ellen Hernandez, which the therapist had used as a way of communicating with him and had improved from initially being chaotic and confused to showing signs of trust and connectedness, again deteriorated. (Test. of E. Hernandez.)
The respondent's explanation at trial for the goodby visit shows her inability, despite her progress in controlling her temper, to focus on her children's needs. At first she claimed that she had merely wanted to find out if they were happy and in stable foster homes. She finally admitted, however, that she had wanted to know if they still loved her because she was not sure how they felt about her. She explained the goodby visit to her therapist, Ms. Al-Sagaf in the same way: that she had felt discouraged and wondered if her children still valued her. This is the conduct and attitude of someone focused on her own needs, not those of her children.
Barbara C.'s plan for reunification shows that focus on herself. When questioned at trial about her daily life, she described a busy routine, which begins in the morning with attending women's, diversity, and religious groups. During the day, she works, attends various relapse prevention groups, and seeks out her various support providers. At least two evenings a week she attends NA and AA groups and a relapse prevention program at ARDC. If any of the children are returned to her, she plans to take them with her to her evening meetings. She testified that some of those groups have child care available but at others the children would have to attend the meeting with her. Leaving aside the question of whether it would be beneficial or detrimental for elementary school aged children to go out with their mother several evenings a week, rather than staying at home for dinner, bath, play, reading, and bedtime, the respondent testified that she believed such meetings might be helpful to the children so that they could better understand her situation and herproblems more. Such thinking is the exact opposite of a child-centered approach. It betrays her continued focus on herself, and her needs. Yet CT Page 17058 children need the opposite. They need parents who can understand and respond to their needs, not someone whose own needs become the focus. This self-focus is similar to her inability to help the children understand that she is responsible for why they are in foster care; instead,
 [s]he does not think that there was reason for the children to be placed and she blames DCF for their removal. This attitude leads her to repeatedly burden her children with her anger toward DCF, making Chris feel angry and leaving Diane feeling as if she had caused all of these problems.
(Vol. II, ex. 5, Dr. Neems report regarding supervised visitation, 1/4/01 at 3.)
Other evidence than from Dr. Neems also showed instances in which the respondent did not respond adequately to her children's needs. A DCF social worker trainee, who conducted home visits with Ms. C. while she was at My Sisters' Place described a chilling incident in which Ms. C.'s eighteen-month-old baby, Tim Jr., sought comfort and nurture from her only to be repeatedly rebuffed and threatened with physical punishment. A letter from her case manager at My Sisters' Place described other, equally distant and unresponsive behavior toward Tim Jr.:[14]
 Barbara on numerous occasions makes Timothy walk to the point of being exhausted. Timothy enters the building screaming and tired from being out all day. Barbara refuses to pick Timothy up even when prompted by staff. Barbara states that he can walk and is spoiled. DCF has offered Barbara a stroller to help Timothy but Barbara has refused this. . . .
(Vol. II, ex. 14, letter of 11/16/01.) The court finds the accounts of the social worker trainee and the letter credible and persuasive.
The sum of this evidence is a sad picture indeed. Barbara C. was herself a beaten and abused child, without a good parental role model. Alcohol, drug abuse, and violence were staples of the household her mother provided. She became a mother while still a child herself. She was on her own, with two children, before yet an adult. As a young mother, she was often homeless. While in homeless shelters, she could not obey program rules — with her upbringing, probably no one ever taught her societal norms of conduct; certainly no one provided the loving, nurturing, supportive home life that helps a child adapt to those norms and learn how to function successfully in society. She has had to learn CT Page 17059 much of this as an adult — how to control her anger, how to distinguish anger from other emotions, how to act in ways others do not perceive as threatening. She has struggled with the demons of addiction and domestic violence. Her formal education over by ninth grade, she has had to spend adult years trying to attain basic educational and vocational skills.
Perhaps it should be no surprise that, even today, after working so hard, and making what all agree is significant progress toward dealing with her many problems, she is still focused primarily on herself, dealing with her own needs and problems, rather than focused on the needs of her children. Both the social work trainee and the My Sisters' Place case worker who recounted the incidents described two paragraphs above, for example, stated that on each occasion, Ms. C. had been highly stressed by the problems and circumstances of her own life. The DCF trainee testified that on the day that she saw Barbara hit Timothy on the hand and rebuff his many requests for comfort, the respondent was upset because she wanted to leave My Sisters's Place but had no financial resources or furniture. Similarly, the MSP case worker concluded her letter by saying:
 Barbara is under great stress from many sources. She is noncompliance [sic] with our program and is on the verge of being terminated as a resident. Barbara threatens to leave but has not secured housing else where at this time. It is our concern that the above behaviors that are being witnessed are due to this stress and that Timothy is the target of her frustration.
Id.
Section 17a-112 "requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child. . . ." (Internal quotation marks omitted.) In re Eden F., supra,250 Conn. 706. Taliyah is an emotionally fragile child at risk of long-term psychological damage. She needs to be in a situation that relieves her present sense of stress, rather than as interaction with her mother does, exacerbating it. After some visits with her mother, she still wets the floor. The evidence shows that Taliyah is extremely sensitive to her mother's anger. Despite repeated feedback from Dr. Neems, the respondent was never able to understand the detrimental effect of her anger on Taliyah or control her displays of anger in front of the child. Not understanding that need, nor able yet to control her anger, she was fundamentally incapable, as of the adjudicatory date, of meeting Taliyah's needs. In balancing all the relevant factors, including CT Page 17060 Taliyah's emotional state and need for permanence now, the limited rehabilitation her mother has achieved, and the adverse effect of the respondent's parenting deficiencies on Taliyah, the court finds by clear and convincing evidence that the respondent could not, as of the adjudicatory date, assume a responsible position in this child's life, given Taliyah's age and needs.
Christopher's physical aggression and Diane's parentification both result in part from their reactions to separation from their mother. Christopher becomes angry and violent; Diane feels responsible and withdraws. Dr. Neems repeatedly told the respondent that her children needed to understand that her conduct was responsible for their separation, but she never did anything to help them gain that understanding. Instead, on occasions, she told them the very opposite. One time, for example, she said to the children that "she could take care of them but that other people thought she couldn't." (Vol. II, ex. 5, Dr. Neems' notes on supervised visit, 8/24/00.) Another time she told them that "Tim had been taken from her for no reason." (Vol. II, ex. 5, Dr. Neems' notes on supervised visit, 11/16/00). Despite the fact that Diane feels responsible for her mother and the DCF interventions, Ms. C. rarely did anything during those visits to relieve Diane of that sense of guilt.
 Ms. C. is unaware that she is being very destructive to Diane in failing to provide Diane with a realistic yet constructive explanation for why the children are in foster care, leaving Diane to feel excessively responsible. Ms. C.'s behavior is largely responsible for Diane's increasingly serious depression.
(Vol. II, ex. 5, Dr. Neems' 1/4/01 "Report Regarding Supervised Visitations," at 3.) Similarly, her failure to take responsibility for her problems and instead blaming DCF "helps to set Chris up to be angry." (Vol. II, ex. 5, Dr. Neems' 10/29/00 "Report Regarding Supervised Visits," at 6.) She "doesn't understand . . . that not helping [Chris] to understand how he got placed in foster care, sets him up to feel angry which has been one of his real serious problems." (Neems Test. of 1/30/01 at 21.)
As Ms. C.'s attorney repeatedly elicited from many witnesses, Barbara C. has never wavered in her desire to be reunited with her children. Both Christopher and Diane staunchly want the same. Dr. Meier even testified that it would be in the best interest of both Diane and Christopher to return to their mother if she could meet their needs. Yet sadly, for both mother and these two children, she is not yet able to understand, focus on, or meet their needs, or those of their younger sister, Taliyah. Diane CT Page 17061 and Christopher need caretakers capable of restraining responses of anger and frustration at the children's conduct; yet Ms. C.'s limited progress toward rehabilitation decompensates under stress. "She gets angry due to various stressors in her life and then handles the children poorly." (Vol. II, ex. 5, Dr. Neems' 1/04/01 "Report Regarding Supervised Visitations," at 2.) Still lacking adequate impulse control, the respondent is not yet ready or able to care for either of these children, as her reactions under stress to Tim Jr.'s needs and the demands of parenting he posed so patently manifest. For all the reasons recited above, the court finds by clear and convincing evidence that as of the adjudicatory date the respondent was not yet able to assume a responsible position in the life of either Diane or Christopher, in view of their individual ages and needs.
As for the second step in the failure to rehabilitate calculus, clear and convincing evidence also establishes that the degree of Barbara C.'s rehabilitation falls short of encouraging a belief that, at some reasonably foreseeable date, she could assume a responsible position in the lives of any of these children, in view of their ages and needs. The failure to rehabilitate TPR statute provides that a respondent's rehabilitation must be foreseeable within a reasonable time, given the needs of the particular child. What is a reasonable time is a factual determination that must be made on a case-by-case basis." (Citation omitted.) In Re Michael L., 56 Conn. App. 688, 694, 745 A.2d 847 (2000). A reasonable time does not mean waiting forever. Instead, the statute requires that the parent be able, within the reasonably foreseeable future, to meet the needs of the specific child at issue.
In the present case, the evidence suggests that the respondent has thepotential to be a fit parent. The psychiatric disorders that erupt into her behavioral problems do not prevent her from addressing her parenting issues. As Dr. Meier noted, she has made progress, but slowly. Dr. Meier also concluded, however, that the prognosis for her ever being able to meet the needs of any of these children is guarded. The slow progress of her rehabilitation to date does not permit any inference as to whether or when she will reach the required level of rehabilitation so as to be able to do so. Despite years of counseling, twice living under residential supervision, numerous anger management and other classes, her anger is not yet under control. Although she has taken parenting classes, the evidence does not indicate that this respondent has a realistic appreciation for Taliyah's sensitivity to her anger, Christopher's anger, or Diane's sense of guilt, or that she has developed a functional plan for meeting their needs if any were returned to her care.
In view of the long time that the respondent has been receiving services, the continuing intractability of her anger and overall limited CT Page 17062 progress, the slow rate of her progress, the guarded prospects for complete rehabilitation, and the likelihood that her future behavior will continue in many ways to replicate her past conduct, there is no reasonable prospect as to when, if ever, she will be able to meet the needs of any of these children. Despite her hard work, and the steadfast desire of Ms. C. and her two oldest children to be reunited, the evidence presented at trial was thus clear and convincing that, as of the adjudicatory date of January 29, 2001, the respondent mother had not rehabilitated herself to the extent that she could then, or within a reasonable time, assume a responsible position in the lives of any of these three minor children, in light of their ages and needs.
2. Abandonment — § 17a-112 (j)(3)(A)
The petitioner has asserted, as one of the statutory grounds for terminating the parental rights of Christopher W. that he has abandoned the minor children. Section 17a-112 (j) of the General Statutes provides that "[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . .
Abandonment "focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [Rev. to 1995] § 17a-112 (b)(1) [now § 17a-112
(j)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . ." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993). The statute requires DCF to show by clear and convincing evidence that a parent has failed to maintain a reasonable degree of interest in the welfare of his or her child.
 Maintain implies a continuing, reasonable degree of concern not a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and CT Page 17063 general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance . . .
(Internal quotation marks omitted.) (Id.)
The court finds by clear and convincing evidence that as of the relevant adjudicatory date,[15] the respondent father Christopher W. had abandoned his two minor children Diane and Christopher. He has had no contact with these children except when the paternal great-grandmother took the children to visit him in Florida in the summer of 1997 or 1998. He has shown none of the attributes of interest, concern, or responsibility for their welfare. He has never maintained regular contact with DCF or their caretakers to inquire about their well being. He has not supported them financially, emotionally, or in any other way.
3. No Ongoing Parent-Child Relationship — § 17a-112 (j)(3)(D)
DCF alleges no ongoing parent-child relationship between Barbara C. and Taliyah and between Christopher W. and his children Diane and Christopher. This allegation invokes General Statutes Section 17a-112 (j) (3)(D), which establishes a basis for termination parental rights when
 there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; . . .
Under this section, the court must "undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In Re John G., 53 Conn. App. 12,22, 740 A.2d 496 (1999). "To satisfy the second prong [of the analysis], the trial court [is] required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship. . . . The `best interest' standard, therefore, does not become relevant until after it has been determined that no ongoing parent-child relationship exists." (Citation omitted.) In reCT Page 17064Kezia M., 33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915,636 A.2d 847 (1993). The factors to be considered in deciding whether it would be in the best interest of a child to permit further time for a relationship with his parent to develop include "(1) the length of stay with the foster parents, (2) the nature of the child's relationship with the foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of the child's relationship to his or her natural parent." (Id.)
(a) Christopher W. with Diane and Christopher
As to the respondent father, there is absolutely no doubt, and the court thus finds by clear and convincing evidence, that there is no ongoing parent-child relationship between Mr. W. and Diane or Christopher. It would be virtually impossible for children of these ages to maintain a parent-child relationship with someone that they had only seen once in the last eight years. He has not provided for or met their needs in any significant way during the pendency of this case. In view of the need of each of these children for permanency and stability now, and considering the relevant factors cited above, the court finds by clear and convincing evidence that it would be detrimental to the best interest of each child to allow further time for such a relationship to develop.
(b) Barbara C. with Taliyah
The court has evidence from a variety sources for considering the parent-child relationship between Barbara C. and Taliyah. These include testimony from the respondent herself, the DCF social worker and supervisor, Taliyah's foster mother, and two expert witnesses, Dr. Meier and Dr. Neems, as well as various documentary exhibits. The quality of information provided on this subject varied considerably. That from the DCF employees and respondent lacked much specificity about the actual relationship between mother and child. The foster mother's testimony focused primarily on Taliyah's life with the foster family. Both psychologists, on the other hand, provided detailed and useful information. Dr. Meier is quite familiar with the respondent, having performed several court-ordered psychological evaluations of her. He also conducted two psychological evaluations of Taliyah, twice assessed the relationship between mother and child, and observed Taliyah with her foster mother. Dr. Neems observed the relationship between mother and child first-hand during the approximately twenty parental visits that he supervised between August 2000 and January 2001. In assessing the parent-child relationship between Barbara C. and Taliyah, the court must therefore rely primarily on the evidence provided by Doctors Neems and Meier. CT Page 17065
As part of Dr. Meier's October 1999 psychological evaluation, he observed Taliyah for one hour with the respondent. Taliyah was comfortable with and responded well to her mother, and Dr. Meier concluded that "despite the length of the separation, there was evidence of some positive feelings. . . ." "The relationship was quite good considering the length of time she had been in foster care." (Vol. II, ex. 1 at 7.) Dr. Meier thus recommended that reunification efforts continue between Taliyah and Ms. C. for an additional six months.
In his November 2000 evaluation, Dr. Meier again observed Taliyah, both with her mother and with her foster mother. He no longer perceived a parent-child bond as existing between Taliyah and Ms. C. (Meier Test. of 2/27/01 at A-16.) A year earlier, Taliyah had been interested in conversation with her mother and had responded well to Ms. C. (Vol. II, ex. 1 at 7 and 10.) By November 2000, although Taliyah played with her mother during the interactional assessment, she also asked during the session to see her foster parents, was most outgoing and happy in her interactions with her siblings, and made a drawing during the session for her foster parents. Dr. Meier concluded that "any attachment to her biological mother is through observing the bonding of the older children, and seeing her for no more than two hours per week." (Vol. II, ex. 2 at 15-16.)
Dr. Neems had many recent opportunities to observe the interactions between Ms. C. and Taliyah. His notes on those visits show somewhat contradictory data regarding their relationship. In one visit, for example, Taliyah arrived sleepily and immediately climbed into her mother's lap. Later however, after Ms. C. had become angry at Taliyah, the child went to Dr. Neems for comfort, "clung to me and apparently didn't want to go to her mother." At the visit's end, Taliyah "was more interested in clinging to [the DCF transportation aide] than she was in saying goodbye to her mother." (Vol. II, ex. 5; notes of 8/24/00 visit at 2.) Dr. Neems' notes and comments on the visits he supervised have other instances of such conflicting data. For example, Taliyah enjoyed interacting with her mother on certain occasions, sometimes sat in her mother's lap, and was disappointed when her mother missed a visit. On the other hand, Taliyah is very sensitive to her mother's anger. (Vol. II, ex. 5, Dr. Neems' 10/29/00 "Report Regarding Supervised Visitations," at 4, 6.) The respondent's displays of anger or hostility in the visitation sessions had "a very negative effect" on Taliyah (Vol. II, ex. 5, Dr. Neems' 1/04/01 "Report Regarding Supervised Visitations," at 3.)
"In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.) In re John G., supra at 23. This CT Page 17066 standard contemplates a relationship that has some positive attributes.In re Jessica M., 217 Conn. 459, 470, 586 A.2d 597 (1991). During the visitation sessions Dr. Neems observed, Taliyah did display some warmth for her mother. Yet her conduct did not show a parent-child bond, only the emotional ties any child might have with a regular visitor. Taliyah now looks primarily to her foster parents for comfort and to meet her day-to-day needs, as one would expect of a child in care with the same family for four years and since she seven months old. There are, moreover, very negative aspects to the respondent's relationship with Taliyah. A sign of the stress Taliyah feels seeing her mother is that she sometimes urinates on the floor after a visit.
The question the court must resolve is whether the petitioner has proven by clear and convincing evidence that there is no longer an ongoing parent-child relationship. "The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks and citation omitted.) In re John G., 56 Conn. App. 12,24, 740 A.2d 496 (1999). The court accepts and finds credible and well-founded the expert opinions of both Dr. Meier and Dr. Neems that Taliyah's relationship with her mother is weak and, after four years in foster care, the result of observing her siblings' interactions with their mother and the visitation sessions, rather than from the respondent's own parental relationship with Taliyah. Dr. Meier, who had a year earlier found an ongoing parent-child bond, concluded in December 2000 that such a bond no longer existed. Their opinions are consistent with the entire body of evidence, which shows none of the characteristics of a parent-child relationship. Instead of possessing positive attributes, Taliyah's relationship with her mother now has seriously detrimental effects on the child. After four years of separation, Ms. C. has become a visiting relative, a familiar adult whom Taliyah knows to be her biological mother, and that of her siblings, but not someone with whom she still has a parent-child relationship. This court finds by clear and convincing evidence that there is no longer an ongoing parent-child relationship between Barbara C. and Taliyah.
As for the second step of the statutory formula, this court has considered all the factors set forth in In re Kezia M., supra,33 Conn. App. 22. Taliyah's fragile emotional state and risk of longterm psychological damage require permanency now, rather than additional delay, which is likely to cause her long-term harm. Emotionally fragile and vulnerable, she needs to be protected from any more stress of being subjected to her mother's recurring harshness and anger. Further visitation with her mother would disrupt her sense of connection with her foster family, with whom she is closely bonded and who meet her needs. The totality of the evidence establishes that Taliyah cannot wait any longer for her mother's uncertain rehabilitation. The court finds by CT Page 17067 clear and convincing evidence that it would not be in Taliyah's best interest to allow additional time to establish or rekindle a parent-child relationship with Ms. C.
 V — DISPOSITION
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase.[16] In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R.,51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a non-consensual case, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes § 17a-112 (k). In re Tabitha P., 39 Conn. App. 353,664 A.2d 1168 (1995).
A. REQUIRED STATUTORY FINDINGS
The court makes the following written findings, as required by General Statutes § 17a-112 (k) in the petitions seeking to terminate the parental rights of Barbara C. and Christopher W. The court has considered these factors and its findings in determining whether it is in the best interest of each of these three children to terminate the parental rights of each respondent. In re Quanitra M., 60 Conn. App. 96, 758 A.2d 863, cert. denied 255 Conn. 903, 762 A.2d 909 (2000). As Timothy B. has consented to the termination of his parental rights, no such findings are required as to him.
 (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k)(1)
As discussed above, the court finds that DCF offered and referred Ms. C. to a vast array of timely and appropriate services and programs. These included referrals for individual, couples, and parenting counseling, anger management and parenting groups, and substance abuse treatment. After evidence concluded in trial of the petitions as to Christopher and Taliyah, the court continued the hearing of the petition as to Diane for DCF to explore additional reunification services. In that interim, DCF offered more supervised visitations, in-home parent-aide services, group sessions and individual support from the City of Hartford Child Development Program, outpatient substance abuse treatment services, CT Page 17068 referrals for more intensive substance abuse treatment after the respondent relapsed, and in-home therapy. No services were offered to the respondent Christopher as he absented himself from the children and DCF.
 (2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended — § 17a-112 (k)(2)
Although the court in 1996 found that reasonable efforts were no longer required to reunite Barbara C. or Christopher W., it also ordered DCF to continue providing reunification services to the respondent mother. In the years between that finding and the relevant adjudicatory date, and between the adjudicatory date and the close of evidence (on April 25, 2001, as to Christopher and Taliyah, and on October 12, 2001, as to Diane), DCF continued to make services available to the respondent mother to reunify her with these three children. During all three of these periods, the services provided by DCF have been reasonable and appropriate to help her address the problems that had rendered her unable to meet her children's needs and, hence, to reunite her with her children. As the whereabouts of respondent father, Christopher W., was unknown, DCF could make no efforts to reunite the children with him.
 (3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112 (k)(3).
No court orders were entered with regard to the respondent father, Christopher W. The court twice entered orders for Barbara C; see footnotes seven and eight above. Ms. C. has kept appointments made by or with DCF; signed releases authorizing DCF to communicate with service providers; kept her whereabouts known to DCF, her attorney, and her children's attorney; participated in substance abuse evaluation, treatment, and relapse prevention programs; participated in many anger management programs; and participated in numerous parenting and individual counseling programs. Since 1999 she has maintained secure and adequate housing and income; had no further involvement with the criminal justice system (except an unspecified contact with the police and court in summer 2001; ex. A-13 at 2-4); and visited the children as often as permitted by DCF.
As described above, she has participated in parenting classes and individual counseling but did not make satisfactory progress toward the CT Page 17069 identified treatment goals. She did not cooperate with all her service providers. Episodic incidents of anger and hostility demonstrate a continuing need to work on anger management problems. Despite in inpatient and outpatient drug treatment, she has continued infrequent substance abuse. She did not comply with DCF requests for random drug screens. She has not yet developed an adequate plan for reunification with her children.
 (4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties — § 17a-112 (k)(4)
Taliyah is closely bonded to her foster parents. Her connection with her mother is very weak, any positive feelings for her mother having attenuated over time. Diane and Christopher are both intensely bonded with and attached to their mother but have no ties at all with their father. As of the close of evidence in her case, Diane was in a relatively new foster placement and had not formed any bond with that family. As of the close of evidence in his case, Christopher had begun to develop an attachment to his foster family but it was not yet close enough to characterize as a parent-child bond despite the fact that he looked to them to meet his needs and they were, hence, his psychological parents.
(5) The age of the child — § 17a-112 (k)(5)
Diane, born on April 1992, is nine years old. Christopher, born on September 1993, is eight years old. Taliyah, born on October 1996, is five years old.
 (6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child — § 17a-112 (k)(6)
CT Page 17070
The respondent father Christopher W. has made no effort to adjust his conduct or circumstances to make reunification with him in the best interest of the children.
The respondent mother, Barbara C., has made many efforts to adjust her conduct to make it in the best interests of her children to return to her home. She has maintained regular contact with her children. She has engaged in therapy, attended numerous services, undergone inpatient and outpatient substance abuse treatment, and participated in parenting, anger management, relapse prevention counseling, classes and groups. She has developed a network of present and former service providers who offer her counseling, support, encouragement, direction, and instruction. As a result of her participation in these various services, she has made progress in addressing the problems that first led to the removal of her children and have prevented her from being able to meet her children's needs. Although she has sometimes not fully complied cooperated with or complied with the directives of her service providers and had difficulty getting along with some case workers at DCF and various service providers, she has continued throughout to attempt to deal with her problems.
 (7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent — § 17a-112 (k)(7)
There is no evidence that a parent, DCF, or any other party has done anything unreasonable to prevent either Barbara or Christopher from maintaining a meaningful relationship with Diane, Christopher, or Taliyah. There is no evidence that the parents' economic circumstances prevented a meaningful relationship with their children.
B. BEST INTEREST OF THE CHILDREN — § 17a-112 (j)(2)
The final element of the termination of parental rights statute, §17a-112 (j), requires that before granting a duly noticed petition for such termination, the court must find, "by clear and convincing evidence . . . (2) that termination is in the best interest of the child . . .
In determining whether terminating the respondents' parental rights would be in the best interest of the minor children here, the court has considered various factors, including the interests of each child "in CT Page 17071 sustained growth, development, well-being, and in the continuity and stability of its environment;" Capetta v. Capetta, 196 Conn. 10, 16,490 A.2d 996 (1985); the specific needs of each child; the length and nature of their stays in foster care; the nature of the relationship with their biological and foster parents; the degree of contact maintained with the biological parent and the potential benefit or detriment of the child's retaining a connection with the biological parent; their genetic bond to each parent, In re Savanna M., 55 Conn. App. 807, 816, 740 A.2d 484
(1999); and the seven statutory factors. The best interest standard is inherently flexible and fact-specific to each child, giving the court broad discretion to consider all the different and individualized factors that might affect a specific child's welfare.
1. Taliyah
Taliyah has been in foster care with the same family for more than four years. She has bonded with the foster parents and calls them "mom" and "dad." The attenuation of her connection to her mother during four years of foster care has resulted in loss of the parent-child relationship with Barbara C. Her mother's anger has a strongly negative effect upon her. Continuing to visit her mother regularly would be detrimental to Taliyah by depriving her of the sense of security and permanence that she needs. (Vol. II, ex. 5, Dr. Neems' "Report Regarding Supervised Visitations," at 6.) In view of Taliyah's age, the length of time she has spent in foster care, her close bond with her foster family, her fragile emotional state and risk of long-term psychological damage posed by continuing contact with her mother, her need for permanence and stability, the uncertain prospect as to when, if ever, the respondent will be able to meet her needs, the lack of strong connectedness to her mother and father, Taliyah's need to be protected from the stress caused by her mother's inability to control her anger and hostility, and the totality of the evidence, the court finds by clear and convincing evidence that termination of both her biological parents' parental rights is in her best interest.
2. Christopher and Diane
Christopher, and his sister Diane, remain closely connected and loyal to their mother. Both want to live with her. They have lived much of their lives in the care of relatives, their mother until removal from her care and then their paternal great-grandmother for four years. Their relationship with their mother is not just a psychological bond with her but the means of "a continuing relationship with cousins and other family members. This connection to family has become important to these children, perhaps as their way of dealing with a sense of abandonment and loss." (Vol. II, ex. 2 at 19; see also Perugini Test. of 1/31/01 at 11, CT Page 17072 19-20; Test. of E. Hernandez.) Each will react emotionally to loss of contact with her. In view of their bond with their mother, it would be in their best interest to be reunited with her were she able to meet their needs. The respondent father Christopher W. has only seen Diane or Christopher once in many years. They have no emotional ties or bonds with him. Each child, after several years in foster care, desperately needs permanency and stability. Both have been diagnosed with ADHD, a disorder that will probably remain with them throughout their lives. Children with ADHD need structure in their lives to help them learn to cope and live with their disorder. Without permanency, they are at risk of never being able to develop a sense of trust and confidence and vulnerable to depression. (Meier Test. of 2/27/01 at A-83-84.)
(a) Christopher
Christopher has significant emotional and behavioral problems. His oppositionality and defiance are a challenge for any caretaker and are likely to elicit strong responses. Despite her steady progress at dealing with her own problems, his mother is clearly not yet ready or able to meet his needs. Whether or when she will be able to do so remains an open question.
Dr. Meier has suggested that it would be detrimental to Christopher to terminate his mother's parental rights if he has no prospect of permanency elsewhere. This court finds, however, Christopher now has such a reasonable prospect but must be freed from the respondents' parental rights to achieve that permanency. He is currently living with foster parents who adore him. They have provided a stable home for him and would consider adopting him. Christopher has the personality and emotional tools to develop a bond with a new caretaker and has begun to do so. In view of Christopher's age, his need for permanency and stability, the length of time he has been in foster care, the uncertain prospect as to when his mother may be able to care for him, the lack of any connection or bond to his father, his capacity to form new attachments, the developing connection with his present foster family, and the totality of the evidence, the court finds by clear and convincing evidence that terminating the parental rights of his mother and father is in his best interest.
(b) Diane
 i) Parental rights of the respondent mother, Barbara C.
Assessing a disposition in Diane's best interest is difficult. Despite her need for permanence, her behavior in foster homes has repeatedly sabotaged her placements, thereby thwarting her need. At the suggestion CT Page 17073 of the parties, the court in April and June 2001 twice continued the trial of her case for more efforts at reunification with her mother. Within days of the June proceeding, however, Barbara had been hospitalized for a suicide attempt. Over the next three months, she relapsed on alcohol and drugs. She resumed living with a domestically violent male partner. Her therapist has suggested that the suicide attempt was an understandable response of acute depression to removal of her infant child by DCF from her care and her own mother's serious illness. Ms. Al-Sagaf is probably correct that removing a nursing child would be traumatic to a mother and that grave illness of a parent would be a natural cause of concern. Yet the intensity of Barbara's response to these concerns is troubling to a court attempting to assess whether or when she can meet the needs of her oldest child and demonstrates the fragility of her rehabilitation.
For more than eighteen months, first at Coventry House and then at My Sisters' Place, the respondent lived in a supervised setting. Although she clearly chafed at having to do so, and was eventually ejected from MSP, while in those controlled environments she had only one substance abuse relapse, in July 2000. At trial she explained that relapse by saying a friend had approached her on the street and given her the marijuana she used. Since January 2001 she has been living in the community, where she has been unable, outside a structured setting, to avoid social circles in which she succumbs to substance abuse. She has tested positive once for alcohol use (.09 blood alcohol level) and once for marijuana use, and has relapsed more often than that. She admitted in late September to an in-home therapist that "she had tried hard to resist and . . . had done well for awhile." But her new live-in partner "consistently pressured her to smoke marijuana and drink alcohol with him" while resisting her suggestions that they attend AA meetings. "Barbara stated that eventually she gave in to Marvin." (Ex. A13 at 3.) She acknowledged to the therapist that she finds "too many distractions [in her current living environment] to prevent her from getting clean" and that she believed "she needed to get away in order to get help." (Id.) She is, moreover, again in a physically abusive intimate relationship, a problem that had been the primary concern of the trial court in the first TPR decision, which found that she was not then rehabilitated.
The events after the court continued the trial of the TPR petition for more reunification efforts thus plainly show that the respondent is not yet ready to care for Diane. The evidence also shows, however, that Diane is not yet ready or able to live in a permanent placement elsewhere. The most recent evidence available to the court was that her current placement, in a specialized foster care home, was already in jeopardy after only a month because of Diane's sabotaging behavior. The petitioner CT Page 17074 suggests in its brief that Diane's best interest "lies in the hope that [she] will be adopted by a family that understands and can accommodate [her] special needs." (Pet. Br. 10/18/01 at 5-6, citing In re DorrellR., 64 Conn. App. 455, 486 (2001).) It argues threefold that (a) adoption by a professional foster care family is most likely to accomplish permanency for her, (b) terminating her mother's parental rights will make her ultimate adoption more probable and (c) it is not in Diane's best interest to languish in foster care.
In another case, the limited progress shown by the respondent would probably not be sufficient reason to forego termination of her parental rights. TPR case law is replete with findings that a respondent's rehabilitative efforts had been "too little, too late" to prevent termination.[17] The propositions asserted by the petitioner are undoubtedly true in a case such as Dorrell R., where the minor child can attach to other families. In that case, the minor child had already successfully bonded to two different foster care placements. A psychologist had concluded it was not in the minor child's interest to return home. (Id. at 461-62, 467-68.) There is no evidence in the present case, however, that Diane can yet attach to any placement outside her biological family. Here, Dr. Meier, the court-appointed psychological evaluator, has credibly concluded that termination of parental rights without permanency elsewhere is not in the child's best interest.
In the eighteen months between Diane's removal from her great-grandmother in March 2000 and the close of evidence in September 2001, she had lived in eight different places. Diane's desire for reunification has thus far stymied each attempt to place here outside her natural family. There is no evidence in the present case that Diane can yet attach to any placement outside her biological family. Thus adoption by any family is not likely or even feasible at this time. Until a change in her behavior, a prospect that the evidence does not preclude but had not yet, as of the close of evidence, evolved beyond mere possibility, it is likely that she will continue to disrupt placements. Dr. Meier concluded that terminating the respondent's parental rights while Diane bounced from one home to another would be worse for her than her present situation. Her mother and, through her mother, her extended biological family, are still a source of support for her. While terminating a parent's rights without a specific prospect of permanency is often in a child's best interest, because termination makes permanency or adoption more feasible, the evidence thus establishes the opposite here.
DCF's brief asserts that "Diane is currently trapped in a perpetual state of limbo, waiting for a mother who will never capable of caring for her." DCF assumes that to "free her from this state" requires "releas[ing] her from the fantasy that her mother will some day be CT Page 17075 capable of providing her with the nurturance, security and stability that she desperately needs and demands at this time." (Id. at 5.) There is absolutely no doubt that Diane needs permanency. Her own behavior continues to thwart that need, as does her mother's inability to resume caring for her. However lamentably, the evidence does not support the proposition that terminating her mother's parental rights will, as DCF argues, free her from the "fantasy" of reunification. At trial, Dr. Meier specifically and credibly rejected such a suggestion by DCF counsel:
 Q. [I]s it in Diane's best interests to have the Department pursue the termination to, at least, free her for the possibility of the Department looking for a home that would be a permanent home for her?
 A. . . . I really can't given an opinion on that cause . . . I don't think it would be in her best interests if she was freed from adoption, lost all contact with her family and was not placed in a permanent home. I do not think that would be in her best interest. So I guess I . . . could not support that as a . . . strong option.
 That may need to occur . . . at a point but I'm not sure doing that, at this point would really resolve problems for her or make the situation any more stable for her.
(Meier Test. of 2/27/01 at A-22.) Dr. Meier concluded instead that, since reunification with the respondent was not then presently feasible, Diane's best interest was "to find a home — whether or not it was an adoptive home — that could be viewed as a long term placement and where she could have supervised visits with her mother and continue some contact with mother. I just feel cutting all ties for her at this point would not be in her best interest." (Id. at A-23.)
Dr. Meier's credible and persuasive opinion, moreover, is consistent with the expert testimony of Dr. Neems as well. Dr. Neems concurred with Dr. Meier that the respondent was "not currently able to parent Diane" and that "Diane strongly seems to want some kind of ongoing connection with her mother." (Neems Test. of 1/30/01 at 15.) He also strongly agreed that Diane needs permanency. Considering these three factors together — her mother's inability to provide care, Diane's need for permanency, and her continuing desire for contact with her mother, Dr. Neems concluded that "it looks like the best plan for her is maybe not a very adequate one." (Id.) It was obvious from the context of his testimony that what he meant by this "best" though "inadequate" plan was CT Page 17076 continued contact between mother and daughter, while Diane was in long-term foster care or with other members of her biological family. (Other portions of the evidence show, however, that this latter option is not feasible here.)
The standard for the total deprivation of a parent's rights is clear and convincing evidence. "The burden of persuasion . . . in those cases requiring a showing of clear and convincing proof is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." Dacey v. Connecticut Bar Assn., 170 Conn. 520,538, 368 A.2d 125 (1976). The credible evidence and facts found by this court as proven do not meet that standard. The evidence in this case does not clearly and convincingly establish that termination is in Diane's best interest. None of the options now open offers a reasonable prospect of permanency: the mother is unable to meet her daughter's needs, but the child prevents permanency elsewhere. For this catch-22 dilemma to end, one of two things must happen: continued growth by her mother ripening into ability to care for her child, or a change in Diane's attitude and behavior while in placement. The evidence suggests avenues leading in both directions remain open.
Barbara's slow and limited progress at dealing with her own problems has clearly not yet matured into an ability to meet her children's needs. Susan King, the director of the specialized foster care program at the Village for Families and Children supervised three visits between Diane and Barbara C. and met separately with the respondent at least two other times in July and August of this year. In those visits Ms. C. was generally appropriate with Diane, did not engage in angry or hostile behavior, but also interacted with her daughter more like a peer than parent. "[E]ven with the provision of cues and opportunities for Ms. C. to ask Diane questions or direct the conversation to focus on Diane's current life, she was unable to do so." (Ex. A1 at 4.) In addition, Ms. C. kept steering conversations with Diane back to her own needs, rather than focusing on the child. From Ms. C.'s obvious present inability to meet her child's needs and since the respondent had already opp received "ongoing services," King surmised that "[i]t is unlikely that continued or repetitive services would produce a significantly different positive result in a timely manner that would address Diane's need for permanency." (Id. at 5.)
Dr. Meier has concluded, however, that Barbara "has the potential of being . . . an appropriate parent at some point." (Meier Test. of 2/27/01 at A-81.) A psychiatric evaluation conducted in 1999 found that Barbara has psychiatric disorders that affect her behavior but do not prevent her CT Page 17077 from addressing her parenting issues. (Vol. II, ex. 16 at 4.) Dr. Meier's psychological testing of her in 1999 suggests, contrary to King's belief, that continued repetitive work with the respondent may in fact help her learn to meet her child's needs. Her performance on the Wechsler Adult Intelligence Scale — Revised was in the low average range. Vocabulary tests showed that she may not always understand directions or statements if not given to her in a concrete manner. Dr. Meier concluded that "work with mother needs to be accomplished with her cognitive level taken into account." Information needs to be presented to her "in a clear, concise, uncomplicated manner for best results. She is likely to learn best if presented with examples and given opportunities to practice what she is taught. Errors are to be expected." (Vol. I, ex. 15 at 3-4.)
Still, the prognosis as to whether the respondent will ever be able to meet her child's needs is, in Dr. Meier's words, "quite guarded." As Dr. Meier testified, and this court concurs, the best predictor of Barbara C.'s future behavior is her past conduct. The services provided to her have helped her to curb her once explosive anger. Yet anger remains a problem, even if no longer erupting into uncontrolled fury or accompanied by violence or threatening gestures. A year ago, in the visits supervised by Dr. Neems she still displayed anger and hostility far too often in front of her children. In the visits supervised by Susan King in July and August of this year, on the other hand, she did not display any inappropriate anger or hostility, a hopeful sign of continued progress, although the fewer number of sessions in the more recent supervised visits cautions against assuming that she has now permanently overcome her anger problem. She still relapses on substance abuse, moreover, and her home life is still afflicted by domestic violence. She still apparently needs the structure and controls of a supervised setting. Yet since she has made some, though insufficient, progress in addressing her anger and Diane today has no clear alternatives elsewhere, continued work with the respondent is appropriate to explore the possibility of her leaming to meet Diane's needs.
Despite Diane's resistance thus far to placements outside her biological family, she too, has potential to evolve from her present dilemma. Her therapist last January, Dr. Perugini, had been providing weekly counseling to help Diane gain insight into, and an "emotional vocabulary" for describing, her feelings. Perugini believed that such insight would be a step toward no longer shutting down and blocking others, including potential care givers, from making emotional contact with her. Concluding that Diane needed more than an hour of therapy per week to gain that insight, she referred Diane to Team Works for more intensive treatment. Unfortunately, for reasons not disclosed by the evidence, Diane may never have entered that or any other intensive treatment program. Dr. Salguero, who conducted the August 2001 CT Page 17078 evaluation, concluded that Diane still needed psychotherapy so that she can gain insight into why she acts as she does. (Ex. no. A12 at 4.) Intensive psychotherapy may provide this child with the tools to resolve her dilemma.
There is also a third possibility, tantalizingly suggested by Dr. Neems, who pointed out in January 2001 that Diane's various foster parents until then had been inappropriately responding to her behavior by trying to discipline her or curtail her privileges. (Neems Test. of 1/30/01 at 15.) He concluded that she needs instead a nurturing, supportive response to her behavior. (Id. at 61.) His observations are consistent with the opinion of Dr. Perugini that Diane has the capacity, if in a warm and consistent home, to form a healthy bond with others than her mother. In the current foster placement, DCF obviously heeded those remarks. The current foster parents have attempted to deal with Diane's behavior in a supportive nurturing way, rather than by disciplining her and withholding privileges. As of yet, however, Dr. Perugini's prediction that a warm foster placement could help Diane form an attachment has not been proven true. The most recent evidence submitted to the court was that this placement was in jeopardy of disruption, but that the foster parents had not yet forsaken their efforts to care for Diane.
The evidence shows three paths potentially leading to the permanency that Diane so desperately needs. The court finds credible the opinion testimony of Dr. Meier that terminating the respondent's parental rights, without a reasonable prospect of permanency elsewhere, is not in Diane's best interest and would possibly be more detrimental to her than her present situation. Her mother is still her primary emotional bond, her link to her extended biological family that is her main sense of security. The evidence before the court fails to meet the standard of showing by clear and convincing evidence that termination of Barbara C.'s parental rights is in Diane's best interest. The court accordingly dismisses the petition to terminate the parental rights of Barbara C. to Diane.
ii) Parental rights of the respondent father, Christopher W.
The court has already found by clear and convincing evidence that in view of Diane's need for permanency and stability, her father's lack of involvement in or contact with her, and considering the totality of the evidence, it would be detrimental to Diane's best interest to allow further time for a parent-child relationship to develop with him. Accordingly, the court also finds by clear and convincing evidence that it is in her best interest to terminate his parental rights.
 VI — ORDERS
CT Page 17079
Having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist to terminate the parental rights of Barbara C. to Christopher and Taliyah, of Christopher W. to Diane and Christopher, and of Timothy B. as to Taliyah, and having determined, upon all of the facts and circumstances presented, that it is in Christopher's and Taliyah's best interest to terminate the parental rights of their biological parents, and in Diane's best interest to terminate the parental rights of her biological father, the court accordingly ORDERS:
The court hereby TERMINATES the parental rights of Barbara C. to Christopher and Taliyah, of Christopher W. to Diane and Christopher, and of Timothy B. as to Taliyah.
The court appoints the Commissioner of the Department of Children and Families as the statutory parent of Christopher and Taliyah for the purpose of securing an adoptive family or other permanent placement for them;
Within thirty days of this judgment, the Commissioner shall submit a written report addressing such permanency plan; DCF shall file such further reports as are required by state and federal law.
As to Diane, although the court has found statutory grounds to terminate the parental rights of her mother, the respondent Barbara C., the court does not find clear and convincing evidence that it is her best interest to do so. Accordingly, the court DISMISSES the petition to terminate the parental rights of Barbara C. as to Diane.
Since the evidence has amply established that Diane is in need of intensive psychotherapy., yet there is no indication she has been provided with such, the court hereby issues the petitioner an ORDER TO SHOW CAUSE why the court should not order a full psychiatric examination to assess and make recommendations as to Diane's treatment needs and how to meet those needs. This court will retain jurisdiction of the file as to Diane until at least the conclusion of the hearing on such order. The clerk will contact counsel for the petitioner, respondent, and minor child to schedule the hearing.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT